(No. 55646.—

DAVID L. POLLARD, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Peavey Mills, Appellant).

*Opinion filed June 1, 1982.*

James M. Gallen, of Evans and Dixon, Inc., of St. Louis, Missouri, for appellant.

Andrew T. Nalefski, of Lakin, Herndon & Peel, P.C., of East Alton, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

An arbitrator for the Industrial Commission found

that on October 17, 1975, petitioner, David L. Pollard, suffered accidental injuries arising out of and in the course of his employment by respondent, Peavey Mills, and awarded him compensation for a period of 12 weeks of temporary total disability and compensation for 20% permanent partial disability. On review, without taking additional evidence, the Industrial Commission, finding that petitioner failed to establish a causal connection between the accident and his condition of ill-being, set aside the award. Petitioner sought *certiorari*, and the circuit court of Madison County, finding that it was against the manifest weight of the evidence, set aside the decision of the Commission and reinstated the award of the arbitrator. Respondent appealed. 73 Ill. 2d R. 302(a).

At the time of the accident petitioner was 28 years of age and employed by respondent as a mill sweeper. At the hearing before the arbitrator petitioner testified that while cleaning flour from the top of an electric motor at respondent's plant he fell from the top of a six-foot ladder and hit a pipe, striking his back, leg, and the side of his knee. Petitioner also sustained cuts to four fingers. Petitioner immediately sought treatment from respondent's plant nurse, Roberta Hopper, who put a pack on his knee, bandaged his fingers, and told him to go back to work. Petitioner returned to work and completed his shift. Petitioner stated that over the next 3½ months he periodically returned to Ms. Hopper for heat treatments for the pain in his back. Petitioner eventually asked if he could seek treatment by Dr. Daniel Jones, a chiropractor, and apparently Ms. Hopper called Dr. Jones and made an appointment for petitioner. Petitioner was first treated by Dr. Jones approximately six months after the accident and had been under his care since that date. In addition, between the time of his initial examination by Dr. Jones and the time of the hearing, petitioner had been treated by several physicians. Petitioner testified that the treat-

ments consisted of therapy and restriction of his physical activity. Petitioner testified that due to his injuries he was unable to return to work for respondent on a regular basis, and over the next four years, 1976 through 1979, he worked occasionally elsewhere. In the latter half of 1977, petitioner worked for Sears between 20 and 30 days on a delivery truck as a furniture mover. In 1979 petitioner worked for Lewis and Clark Community College on a student work grant performing tasks varying from grading papers to wiping off machines. During this time petitioner was enrolled as a student at Lewis and Clark Community College in the automotive program. Petitioner testified that the extent of the physical activities required in relation to his automotive training was to "get your hands dirty." Petitioner admitted to repairing the transmission of his car in 1976 and stated that after performing this work he suffered physical difficulties which required him to see Dr. Jones. Petitioner described his ailments at the time of the hearing as pain in his low back, numbness in his legs, difficulty in walking, and the inability to lift anything heavy. At the time of the fall off the ladder he weighed between 285 and 300 pounds.

On cross-examination petitioner admitted that he saw Ms. Hopper on November 11, 1975, and complained of pain in his left hip. He denied that he told her that "he had been laying on the cold, wet ground the night before working on a car." During 1976 he had performed various automotive work such as tune-ups and changing tires and stated that he was paid by the people for whom he did the work. Petitioner testified that he knew Dr. Jones prior to March of 1976 because about one and a half years prior to that time he had worked with Dr. Jones at respondent's plant. Petitioner could not remember the dates but stated that Dr. Jones had released him to return to work two or three times during his period of treatment. He had been advised by two physicians to

wear a back brace but did not wear one because he could find none to fit him. Petitioner stated that his employment by Sears was on a periodic, as-needed basis and that he worked a full week during Christmas week, "the heaviest week they've got." On redirect examination, petitioner testified that during the period from 1976 through 1979 he frequently turned down auto repair work such as motor overhauls, transmission repairs, rear-end repairs, and exhaust-system repairs. On being questioned by the arbitrator, petitioner testified that working for Sears he had earned between $1,200 and $1,400 and that his earnings for auto repair work over the entire period between 1976 and 1979 were between $1,400 and $1,600. Petitioner estimated that his earnings for 1979 were approximately $1,100.

Dr. Jones, called by petitioner, testified before the arbitrator that on March 3, 1976, he received a call from Ms. Hopper and was told that petitioner desired treatment for a back injury. Dr. Jones saw petitioner that same day and in taking a history was told that his injuries, consisting of pain in the shoulder, neck, low back, and down both legs, resulted from a fall from a ladder at respondent's plant. The examination at that time indicated that there was some subluxation of the vertebrae. Petitioner was treated and released for regular work on March 8, 1976, and advised to try to do his work without any additional stress. The treatment consisted of the manual manipulation of the affected areas and deep heat and traction. Dr. Jones continued to treat petitioner through July of 1976, when he discovered that petitioner's condition had gradually worsened. On July 26, 1976, Dr. Jones advised petitioner to stay off work. The doctor's records showed that petitioner reported on August 7, 1976, that his right leg gave way and he fell. Dr. Jones attributed the problems with petitioner's right leg to the fall from the ladder. On August 30, 1976, Dr. Jones released peti-

tioner to return to work on a restricted basis but was advised by petitioner that respondent would not allow a return to work under those circumstances. Petitioner was again released to return to work on November 30, 1976, at which time an improvement in his condition was indicated. An examination on January 1, 1977, showed that petitioner's condition had worsened and Dr. Jones again took him off work. Dr. Jones stated that according to his records petitioner had not returned to work since that date. Dr. Jones stated that treatment during each office visit throughout this period of time consisted of manual manipulation of the spine and traction, and that the office visits were between two and five days and sometimes up to a week apart. During May petitioner had been complaining of occasional pain extending to the right leg and in the lower back area. Because petitioner's condition had not improved satisfactorily, Dr. Jones referred petitioner to a neurosurgeon for examination. On July 11, 1978, petitioner again reported that his right leg gave way and he fell, aggravating the injury in his lower back. Dr. Jones testified that based upon his examination of petitioner's X rays he was of the opinion that the injury to petitioner's lower back suffered in the fall from the ladder caused his leg to give way, causing the later fall. Petitioner reported similar problems on October 17, 1978, March 16, 1979, and December 28, 1979. Dr. Jones stated that during 1979 petitioner was on a once-a-week treatment schedule. He stated that, based on a reasonable degree of chiropractic certainty, the original fall from the ladder was the cause of petitioner's complaints, for which he was treated from the time of the original examination to the present. Dr. Jones stated that his diagnosis for petitioner was that there was a subluxation of the fifth lumbar vertebra, a thinning of the fifth lumbar disc, sciatic nerve involvement of both legs, and a compression fracture of the twelfth thoracic vertebra. Dr. Jones' prognosis for peti-

tioner was that he was stabilized quite well and that no change was expected. Dr. Jones stated that the nerve involvement appeared to be of a permanent nature and predicted that it would cause occasional problems in petitioner's lower back and problems with the muscle coordination in the legs. Dr. Jones stated that in his opinion petitioner was unable to perform all the jobs that were required at respondent's plant because of the heavy lifting and continuous bending and twisting involved. Dr. Jones explained that occasional lifting not in excess of 25 to 30 pounds would not be objectionable from a chiropractic standpoint.

On cross-examination, Dr. Jones stated that the injury in October of 1975 was not the sole cause of petitioner's problems and that the examination and X rays revealed that both the thinning of the fifth lumbar disc and the compression fracture existed prior to the injury. Dr. Jones stated that he was aware that petitioner was performing auto repairs throughout the period and stated that in his opinion the extent of his work as described by petitioner was permissible. Dr. Jones was not aware that there was any type of regular automotive repair work being performed. He was not aware that petitioner had been working for Sears for approximately six or seven months in late 1977 and early 1978, nor was he aware that petitioner was employed by the college. Dr. Jones admitted that a weight loss would improve petitioner's physical condition and decrease his symptoms. On redirect examination Dr. Jones stated that it was his opinion that the injury of October 17, 1975, aggravated the preexisting problems with petitioner's back. It was his opinion that petitioner could have been performing the automotive work described at the hearing within the limitations prescribed. On re-cross-examination Dr. Jones stated that petitioner suffered no fracture as a result of the original fall.

Roberta Hopper, respondent's plant nurse, testified that while employed by respondent she had occasion to see petitioner on numerous occasions in the nurse's office at the plant. On April 14, 1975, petitioner complained of stiffness on the left side resulting from working outside at his home. Ms. Hopper again saw petitioner on October 13, 1975, at which time he reported a fall off a ladder and complained of cuts and abrasions to the tips of his fingers and of pain in his right hip on the side. She stated that it was the practice to record the complaints of workers and stated that other than the pain in the right hip and fingers petitioner made no other complaints on October 13, 1975. Petitioner returned to the nurse's station on October 14, at which time she redressed his fingers and noticed discoloration on petitioner's right hip. Petitioner told her that his hip and back were not hurting at that time. When asked if petitioner indicated an absence of pain in the back and hip on October 14, 1975, she testified, "No severe complaints." Ms. Hopper stated she subsequently treated petitioner on October 28, and October 29, for a foreign object in his eye, and at these times there were no complaints of pain in the neck, back, hip or leg area. On November 11, 1975, petitioner came to the office complaining of pain in his left hip, and that was the first time pain in the left hip was mentioned. Petitioner told her he had been working on a car at home and it was cold and wet on the ground. Petitioner was advised that cold would affect the pain. She next saw petitioner on March 3, 1976, at which time he asked if he could be seen by Dr. Jones. Petitioner stated he had been hurting the last three weeks. March 3, 1976, was the last time she saw petitioner in her office. On that date, she contacted Dr. Jones and advised him of petitioner's complaints and condition. She was the only person who worked in the nurse's office during the time in question. Her treatments of petitioner consisted of heat treatments and administer-

ing medication consisting of a slight muscle relaxant and pain medication which relieves minor discomfort.

Petitioner offered into evidence the deposition of Dr. Robert F. Underwood a physician, taken on September 13, 1979. Dr. Underwood stated he first examined petitioner on January 12, 1977, at which time petitioner told him that he had fallen off a ladder at work and injured his low back and upper back, the area between his shoulder blades. Petitioner complained of numbness in the left leg and tenderness in the left knee. Examination revealed tenderness over the thoracic and lumbar vertebrae and tenderness and swelling in the area of the left knee. Dr. Underwood continued to treat petitioner until April 23, 1977. Treatment consisted primarily of diathermy and injections of Demerol, and petitioner was placed on Fastin, a medication to suppress the appetite and encourage weight loss. Petitioner was hospitalized on two different occasions during this period. Treatment while hospitalized consisted of being kept in traction, physical therapy, various medications for pain and relaxing muscles, and being placed on a low-calorie diet. The findings of the X rays taken during this time were essentially normal. Dr. Underwood's diagnosis for petitioner's condition was severe low-back strain and soft-tissue injury to the left knee. Dr. Underwood stated that in his opinion these conditions were the result of the injury suffered at work which petitioner had described to him.

Respondent introduced into evidence the deposition of Dr. Marvin R. Mishkin taken on August 9, 1977. Dr. Mishkin first examined petitioner on October 22, 1976, at which time petitioner weighed 275 pounds and complained of diffuse back pain. Dr. Mishkin found a lack of correlation between his objective findings of no muscle spasm and petitioner's subjective complaints of back pain. Overall, petitioner's X-ray findings were normal. Dr. Mishkin's diagnosis was that there was no objective evidence of

musculoskeletal disability. Other than petitioner's chronic obesity, Dr. Mishkin found no evidence to account for petitioner's prolonged and nonspecific complaints of pain. Respondent introduced into evidence a second deposition of Dr. Mishkin taken on August 7, 1979. Dr. Mishkin had again examined petitioner on December 15, 1978, at which time petitioner weighed 334 pounds. Petitioner's X rays showed no change. After examining petitioner's history of hospitalization and tests, including a negative myelogram, Dr. Mishkin concluded that these records were consistent with his lack of findings to account for petitioner's pain. In response to questioning, Dr. Mishkin opined that there was no need for petitioner to be under chiropractic care and stated that, depending upon the nature of the chiropractic treatment, manual manipulation of the back could itself be a cause of trauma to the back. Dr. Mishkin's diagnosis remained the same.

During the period between the time petitioner was first treated by Dr. Jones and the date of the hearing before the arbitrator petitioner was hospitalized several times and examined and treated by several other physicians. On each occasion, petitioner attributed his condition of ill-being to the fall from the ladder at work. The medical findings were essentially low-back strain and chronic obesity.

The sole issue presented is whether the Industrial Commission's determination that petitioner failed to show a causal connection between his condition of ill-being and the fall at respondent's plant was against the manifest weight of the evidence. Respondent contends that there was ample evidence in the record to support the Commission's finding. In support of this contention respondent points to the absence of corroborating medical entries in the plant medical records referable to petitioner's purported complaints of back pain and treatment thereof. Respondent submits that although petitioner claimed he re-

peatedly returned for heat treatments for back pain during the 3½ months following the fall, no such contact or treatment was substantiated by Ms. Hopper or her records. Respondent argues too that petitioner's complaints throughout the course of his treatment by the numerous physicians who examined him were inconsistent in that petitioner's complaints varied from lower back pain extending to the right leg, to complaints only of pain on the left side, as well as such miscellaneous complaints as pain to the upper back, throat, and neck, and nausea, all of which petitioner attributed to his fall from the ladder. Finally, respondent points to the conflicting medical opinions as to the causal relationship between the fall and petitioner's alleged complaints. Respondent argues that this case turns upon the credibility of the witnesses and submits that it is the function of the Industrial Commission to resolve such factual questions.

Petitioner contends that complaints of pain to his lower back area were consistently made to medical personnel and that in giving the history of his accident he consistently related the cause of his injuries to the fall off the ladder at work. Petitioner points out that both Dr. Jones and Dr. Underwood attributed his condition of ill-being to his on-the-job fall and argues that the record is void of any contradicting testimony as to the cause of his condition of ill-being. Petitioner attempts to discredit Dr. Mishkin's opinion on the basis that his first examination of petitioner did not take place until October of 1976, one year after the injury, and on the ground that Dr. Mishkin examined petitioner at the request of respondent.

The question whether the injury complained of was causally related to petitioner's employment was a question of fact for the Industrial Commission. The Commission's determination will not be set aside unless contrary to the manifest weight of the evidence, particularly where it involves the resolution of conflicting medical opinions.

(*Ford v. Industrial Com.* (1981), 86 Ill. 2d 126; *Caradco Window & Door v. Industrial Com.* (1981), 86 Ill. 2d 92, 99.) Here there was medical testimony in the record from which the Commission could have inferred that petitioner's condition was not causally related to the accident which occurred at his place of employment. Although Dr. Jones and Dr. Underwood concluded that there was a causal relationship between petitioner's alleged complaints and the work-related fall, there is no requirement that the testimony of a treating physician be given greater weight than the testimony of a physician who has examined the employee solely for the purposes of testifying. (*Arcole Midwest Corp. v. Industrial Com.* (1980), 81 Ill. 2d 11, 16.) While petitioner contends that he complained of back pain for approximately 3½ months after the accident, Ms. Hopper's testimony did not corroborate this contention. It is the function of the Commission to assess credibility and draw reasonable inferences from testimony, and we may not substitute our judgment simply because we might have reached a different conclusion. On this record we cannot say that the Commission's determination as to causal connection was contrary to the manifest weight of the evidence.

For the reasons stated, the judgment of the circuit court of Madison County is reversed and the decision of the Industrial Commission is confirmed.

*Judgment reversed.*